706 A.2d 1151

ANGELA M. ROPER AND CRAIG R. ROPER, PLAINTIFFS–
APPELLANTS, v. RICHARD C. BLUMENFELD, D.D.S.,
DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued February 18, 1998—Decided March 9, 1998.

220

Before Judges PRESSLER, CONLEY and CARCHMAN.

*Adrian I. Karp* argued the cause for appellants.

*Stephen H. Schechner* argued the cause for respondent (*Schechner & Decker*, attorneys; *Mr. Schechner*, of counsel and on the brief; *Virginia T. Shea*, on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

Plaintiffs appeal a dismissal of their dental malpractice complaint based on a jury finding that they did not demonstrate that defendant deviated from the accepted standard of care when he attempted to extract tooth # 31 from plaintiff Angela M. Roper (hereinafter plaintiff). As a result of this finding, the jury did not reach the issues of proximate cause or damages. We reverse.

Plaintiff claims damage to her right inferior alveolar nerve, the symptom of which is permanent numbness. The nerve lies just underneath the roots of the molar teeth. Here is what occurred. On December 7, 1991, while biting down on a Goober's chocolate candy, plaintiff broke off a portion of her lower second right molar (tooth # 31). On either Monday or Tuesday, she made an appointment with defendant for early Thursday evening, December 12, 1991. She experienced "slight tingling," some sensitivity to hot and cold, but no pain or numbness.

Defendant practices general dentistry. After examining plaintiff's tooth and taking x-rays, defendant diagnosed irreversible pulpitis, an inflammation of a dying nerve within the tooth, but not affecting the inferior alveolar nerve. He advised plaintiff that she had two options, either a root canal or extraction of the tooth. Plaintiff agreed to the extraction. She claims, however, that defendant failed to discuss with her any of the risks inherent in tooth extraction, particularly temporary or permanent numbness. Defendant, on the other hand, insisted that he warned plaintiff of several possible risks associated with extractions including swelling, infection, numbness and a broken jaw.

In any event, and after plaintiff signed a consent form, the procedure commenced. The procedure was obviously difficult;

five injections of anesthesia were required and the procedure lasted one and one-half hours. According to plaintiff, she heard "a lot of really horrible crunching noises" and experienced pain.

During the extraction, defendant placed a dental elevator [1] between teeth # 30 and # 31 and "luxated" tooth # 31, producing some very slight movement. When defendant attempted this, plaintiff felt pain; that was when he gave her the fifth injection. Then he placed forceps on the crown of the tooth as far down as possible. Applying pressure, the bone should expand to allow the tooth out. At this point, the top of the crown of plaintiff's tooth fractured and defendant suctioned the area, removing tooth fragments with the dental elevator. When the crown and part of the tooth fractured horizontally below the gum, it left the residual root of the tooth "deeply embedded in bone." After taking an x-ray to confirm this and recognizing that retrieval of the root tip required cutting through the side of the gum, a procedure beyond his expertise, defendant called Dr. Michael Erlichman, an oral surgeon, and arranged for him to remove the root the following morning.

Numbness is a sign of injury to the inferior alveolar nerve. There was much dispute over when plaintiff began to experience such numbness. It was critical whether she experienced numbness shortly after defendant's procedure, for if she had done so that would indicate an injury to the nerve. The evidence as to this is as follows.

After the procedure, plaintiff left defendant's office and drove to her mother's house to spend the night. Arriving at the house, while "very upset," plaintiff was not in pain, but the inside of her lip and chin were numb. She spoke with her husband who testified that he did not recall whether she had complained of any numbness to him at that time. Mrs. Russo, plaintiff's mother, however, testified that when her daughter arrived at her house,

---

[1] A dental elevator is a device which is wedged between two teeth to loosen one tooth in order to extract it with forceps.

her face was swollen and she was very upset, telling her that her lip, chin and jaw were numb. When plaintiff awoke in the morning, her right lower lip and jaw were still numb and her face was swollen. Upon attempting to drink some coffee with her mother, she noticed that she was drooling and could not sense that the temperature was hot.

Plaintiff was driven to Dr. Erlichman's office by her friend, Terry Ross. Terry Ross testified that during the drive to Dr. Erlichman's office, the right side of plaintiff's face was very swollen. She testified that plaintiff told her that her face was numb, but she did not complain of any pain. Defense counsel's objection, however, to her testimony concerning plaintiff's complaints of numbness, was sustained.

Although, therefore, plaintiff maintained that she had complaints of numbness prior to her appointment with Dr. Erlichman, it seems that she did not inform Dr. Erlichman about this. Dr. Erlichman's office records reflect only that plaintiff was anxious and complaining of pain in the temporal area, but contain no complaints of numbness. The record does not reflect, however, whether plaintiff was asked by anyone in Dr. Erlichman's office if she had numbness. In any event, she signed a consent form which provided in part:

> Dr. Erlichman has explained to me that there are certain inherent and potential risks in any treatment plan or procedure, and that in this specific instance such operative risks include, but are not limited to:
>
> . . .
>
> Injury to the nerve underlying the teeth resulting in numbness or tingling of the lips, chin, gums, cheek, teeth and/or tongue on the operated side; this may persist for several weeks, months, or in remote instances, permanently.

Dr. Erlichman testified that he removed the root tip by making "a tiny incision in the gum," removing a piece of bone, and then teasing the root from its socket. The surgery took thirty-five minutes. He denied injuring plaintiff during the procedure and claimed not to have seen any damage to the nerve. He testified that a patient can sustain an altered sensation from an extraction

of a tooth in several ways including post-operative swelling, such as that observed in plaintiff directly adjacent to the extraction site. On cross-examination he testified that he did not see any damage to the nerve when he looked in the nerve canal.[2]

On December 15, 1991, plaintiff telephoned Dr. Erlichman's office and complained of numbness in her right chin and lower lip. When Dr. Erlichman asked if she had experienced this problem before his surgery, she stated that she was not sure. Dr. Erlichman testified that the only condition of numbness that he had discussed with her was after the extraction. He insisted a patient's complaint of numbness would be denoted in his records.

Plaintiff's expert, Dr. Alan Schwimmer, D.D.S., a board certified oral and maxillofacial surgeon at Beth Israel Hospital in New York, examined plaintiff on April 8, 1993. He confirmed that plaintiff suffers from hypesthesia (numbness) of the lip and chin on the right side of her face. In his opinion, and premised upon plaintiff's immediate and continuing complaints of numbness following defendant's treatment, defendant deviated from the accepted standard of care because the extraction of tooth # 31 "ought not to cause permanent injury to the inferior alveolar nerve. It is not an expected anticipated or reasonable complication of the extraction." He found a deviation based, further, upon the length of defendant's procedure, the fact that plaintiff experienced pain during it and the use of the elevator. He was convinced that defendant must have used "[e]xcessive force, extensive manipulation of the tooth" or allowed the elevator to slip. But he conceded that he had no factual support for his theory as to how the dental elevator was used and how the injury had occurred. Dr. Schwimmer insisted that because he believed that plaintiff was injured prior to seeing Dr. Erlichman, as reflected by her com-

---

2 Plaintiff's expert, Dr. Alan Schwimmer, D.D.S., insisted that this is a medically unreasonable statement because the nerve has to be dissected out in order for injury to it to be observed.

plaints of numbness, Dr. Erlichman's surgery could not have caused her injury.

Defendant's expert, Dr. Marvin J. Ladov, D.D.S., a board certified oral and maxillofacial surgeon reviewed defendant's treatment and also examined plaintiff. In his opinion, defendant did not deviate from the standard of care. He had no criticism regarding the number of injections given to plaintiff or the manner of defendant's extraction. He did not believe that defendant's treatment caused plaintiff's numbness, noting that examination of plaintiff's pre-operative and post-operative x-rays indicated that the root of the tooth appeared to be in the same position. Dr. Schwimmer agreed that there was no visual evidence from the pre-operative and post-operative x-rays that plaintiff's root tip was invading or affecting the inferior alveolar canal when she left defendant's office. He admitted, however, that x-rays will not depict nerve damage. It was his opinion that the damage to plaintiff's nerve resulted from Dr. Erlichman's surgery because he was "surgically operating in the vicinity of that nerve, very close to that nerve" and a "known risk ... of root removal ... near a nerve ... [is] numbness." Further, he testified that plaintiff's tooth "had long roots and it had a conical root. That's unusual for tooth 31." Due to the intertwined nature of plaintiff's conical root, there "was really no way" the tooth could have been "moved downward" by defendant so as to impinge upon the alveolar nerve. He also disputed Dr. Schwimmer's opinion that the presence of numbness depicts negligence. He was adamant that numbness can occur in the absence of someone's negligence. It was his opinion that plaintiff's paresthesia was an inherent risk of the extraction of her tooth. A critical issue for the jury to resolve then, was the difference of opinion as to whether injury to the inferior alveolar nerve was an inherent risk of the procedures performed by defendant or an indication of negligence.

On appeal, plaintiff raises the following issues:

POINT I. THE TRIAL JUDGE'S REFUSAL TO CHARGE THE DOCTRINE OF *RES IPSA LOQUITUR* AS SPECIFIED IN THE STANDARD CIVIL

JURY CHARGE 5.13 [INCLUDING WHERE "EXCLUSIVE CONTROL" IS IN ISSUE] CONSTITUTES REVERSIBLE ERROR.

POINT II. THE PREJUDICIAL EFFECT OF THE TRIAL JUDGE'S ERRONEOUS CHARGE OF AN EXERCISE OF JUDGMENT WAS NOT AND COULD NOT BE CURED BY HER SUBSEQUENT BRIEF COMMENT AND UNRELATED RECHARGE OF THE JURY AND CONSTITUTES REVERSIBLE ERROR.

POINT III. THE TRIAL JUDGE ERRED IN REFUSING TO ALLOW NICOLINA RUSSO AND TERRY ROSS TO OFFER TESTIMONY AS AN EXCEPTION TO THE HEARSAY RULE PURSUANT TO *N.J.R.E.* 803(c)(3) SINCE THIS WOULD HAVE CORROBORATED PLAINTIFF'S TESTIMONY ON THE CENTRAL ISSUE OF WHEN PLAINTIFF FIRST EXPERIENCED NUMBNESS OF THE LOWER JAW.

POINT IV. THE TRIAL JUDGE ERRED IN DENYING THE ADMISSIBILITY OF THE POST-OPERATIVE INSTRUCTIONS WHILE ADMITTING THE INFORMED CONSENT FORM AND IN LIMITING COMMENTS DURING THE SUMMATION OF PLAINTIFF'S COUNSEL.

POINT V. THE TRIAL JUDGE ERRED IN HER RULINGS ON THE USE OF A DENTAL ARTICLE WHICH WAS PUBLISHED SUBSEQUENT TO DEFENDANT'S NEGLIGENT TREATMENT WHICH INFLICTED INJURY UPON PLAINTIFF.

POINT VI. PLAINTIFF SHOULD BE GRANTED A NEW TRIAL BECAUSE THE JURY'S VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

■ We have considered these issues in light of the entire record and applicable law. We are convinced that points I and III require a reversal and new trial. We need not address plaintiff's other contentions. Since there will be a new trial, however, we comment on point V only to note that plaintiff did not object to the use of the 1992 *Parameters of Care for Oral and Maxillofacial Surgery: A Guide of Practice, Monitoring and Evaluation* in connection with the cross-examination of her expert and the examination of defendant's expert on the basis that it did not satisfy the learned treatise exception to the hearsay rule. *See Jacober v. St. Peter's Med. Ctr.,* 128 *N.J.* 475, 491, 608 *A.*2d 304 (1992), *modified in part on other grounds,* 130 *N.J.* 586, 617 *A.*2d 1213 (1992); *N.J.R.E.* 803(c)(18). Her contention was that since the article was not published until 1992, it could not reflect the standard of care in 1991 at the time of the alleged malpractice and thus was irrelevant. *See Kimmel v. Dayrit,* 301 *N.J.Super.* 334, 356 n. 11, 693 *A.*2d 1287 (App.Div.), *certif. granted,* 151 *N.J.* 465,

700 *A.*2d 878 (1997). But the article was not used to establish a standard of care. It was used to impeach Dr. Schwimmer's assertion that damage to the inferior alveolar nerve when extracting tooth # 31, and thus permanent numbness, was not an expected injury of such extraction. This, of course, was critical to plaintiff's theory of liability for, although Dr. Schwimmer attempted to explain how the injury occurred with the use of the elevator device, it is evident that the basic premise of his opinion was his assertion that plaintiff was injured by defendant. That injury was evidenced by her immediate and continuing numbness. Thus, the essence of the doctor's opinion was that because plaintiff sustained an injury during defendant's failed attempt at extraction, defendant must have deviated from the standard of care because such injury is not a medically accepted risk of the procedures he performed. As to this claim, the article is quite relevant for it lists as a known risk and complication of "erupted" teeth "[o]ralfacial neurologic dysfunction." [3]

*I*

And this leads us to *res ipsa loquitur.* Ordinarily, a medical malpractice claim requires that " 'the standard of practice to which [the defendant] failed to adhere must be established by expert testimony.' " *Kelly v. Berlin,* 300 *N.J.Super.* 256, 264–65, 692 *A.*2d 552 (App.Div.1997) (quoting *Rosenberg ex rel. Rosenberg v. Cahill,* 99 *N.J.* 318, 325, 492 *A.*2d 371 (1985)). *See Sanzari v. Rosenfeld,* 34 *N.J.* 128, 134–35, 167 *A.*2d 625 (1961). A plaintiff may, however, in certain limited circumstances, demonstrate negligence without expert opinion as to a standard of care and deviation if evidence is presented that would allow the jury to reasonably infer that the harm would not have occurred but for the

---

[3] Dr. Schwimmer disputed the efficacy of the article, asserting that it was a "defensive" publication. He also asserted that other articles which include nerve damage or permanent numbness as a known risk of extraction relate to tooth # 32, not tooth # 31. He contended tooth # 32 is in much closer proximity to the alveolar nerve. These criticisms of the articles, including the "parameters," were, of course, for the jury to consider.

doctor's negligence. *Sanzari v. Rosenfeld, supra,* 34 *N.J.* at 140–41, 167 *A.*2d 625. In this respect, *res ipsa loquitur* creates an allowable inference of defendant's negligence when three elements are shown: (1) the accident which produced a person's injury was one which ordinarily does not happen unless someone was negligent; (2) the instrumentality or agent which caused the accident was within the defendant's exclusive control and (3) there is no indication in the circumstances that the injury was the result of plaintiff's own voluntary act or neglect. *Buckelew v. Grossbard,* 87 *N.J.* 512, 525, 435 *A.*2d 1150 (1981); *Luciano v. Port Auth. Trans–Hudson Corp.,* 306 *N.J.Super.* 310, 313, 703 *A.*2d 690 (App.Div.1997) (citing *Eaton v. Eaton,* 119 *N.J.* 628, 638, 575 *A.*2d 858 (1990)); *Maciag v. Strato Med. Corp.,* 274 *N.J.Super.* 447, 460, 644 *A.*2d 647 (App.Div.1994).

*Res ipsa loquitur* has been described as a rule of circumstantial evidence. *Myrlak v. Port Auth. of New York and New Jersey,* 302 *N.J.Super.* 1, 12, 694 *A.*2d 575 (App.Div.), *certif. granted,* 152 *N.J.* 10, 702 *A.*2d 349 (1997); *Tierney v. St. Michael's Med. Ctr.,* 214 *N.J.Super.* 27, 30, 518 *A.*2d 242 (App.Div.1986), *certif. denied,* 107 *N.J.* 114, 526 *A.*2d 184 (1987). The doctrine is grounded in probabilities as to an accident's having occurred without negligence on the part of a defendant. "[D]epending upon the probabilities, the *res ipsa loquitur* doctrine can apply in a medical malpractice context." *Buckelew v. Grossbard, supra,* 87 *N.J.* at 526, 435 *A.*2d 1150. "Where, for example, a surgical sponge is left inside a patient after an operation, it is reasonable to say the probability is that someone has been negligent." *Sanzari v. Rosenfeld, supra,* 34 *N.J.* at 140, 167 *A.*2d 625.

Unlike the related but distinct doctrine of common knowledge, *res ipsa loquitur* requires expert testimony "to the effect that the medical community recognizes that an event does not ordinarily occur in the absence of negligence." *Buckelew v. Grossbard, supra,* 87 *N.J.* at 527, 435 *A.*2d 1150; *Smallwood v. Mitchell,* 264 *N.J.Super.* 295, 297–98, 624 *A.*2d 623 (App.Div.), *certif. denied,* 134 *N.J.* 481, 634 *A.*2d 527 (1993). Although we

observed in *Wagner v. Deborah Heart & Lung Ctr.*, 247 *N.J.Super.* 72, 77–78, 588 *A.*2d 860 (App.Div.1991), that "[o]ne exception *to the necessity for an expert* witness to establish the standard of care and deviation is recognized when the doctrine of *res ipsa loquitur* is applicable" and that "before *res ipsa loquitur* may be utilized *to avoid the necessity of an expert*, plaintiff's evidence must demonstrate that occurrence itself ordinarily bespeaks negligence," we were referring to the necessity of an expert as to a standard of care and deviation. (Emphasis added). Where *res ipsa loquitur* applies, plaintiff need not establish a medical standard of care and deviation. But if *res ipsa loquitur* is to be relied upon, there must be expert testimony to the effect that the medical community recognizes that the injury would not have occurred without negligence so as to establish the first element of *res ipsa loquitur*.

Frequently, however, a plaintiff's expert, in addition to offering a *res ipsa loquitur* opinion, will also attempt to provide an opinion as to a standard of care and deviation in the actual procedure, such as did plaintiff's expert here. This, of course, is done to avoid a "net opinion" problem. Nonetheless, where there is expert testimony in a medical malpractice case that the particular event or injury would not have occurred had the targeted defendant adhered to the appropriate standard of his profession, and regardless of the strength or weakness of any other aspect of the expert's opinion, a plaintiff is entitled to rely upon *res ipsa loquitur* either to overcome a motion for involuntary dismissal or as a basis for the jury to draw an inference of negligence. *Buckelew, supra,* 87 *N.J.* at 527, 435 *A.*2d 1150.

Moreover, the "plaintiff is not required to eliminate with certainty all other possible causes or inferences, which would mean that the plaintiff must prove a civil case beyond a reasonable doubt. All that is needed is evidence from which reasonable persons can say that on the whole it is more likely that there was negligence associated with the cause of the event than that there was not." W. Page Keeton et al., *Prosser and Keeton on the Law*

*of Torts,* § 39, at 248 (5th ed.1984); *Brown v. Racquet Club of Bricktown,* 95 *N.J.* 280, 292, 471 *A.*2d 25 (1984).

As we have said, plaintiff's evidence here was essentially that an injury of the type she sustained does not occur without a deviation. To be sure, defendant hotly disputed both the factual assertion that her numbness, and thus nerve damage, had its onset immediately after his treatment and prior to Dr. Erlichman's treatment and also that such injury is not an expected risk of a tooth extraction of the type performed here. But we have held that "[i]f the evidence presents a factual issue as to how an accident occurred, and the *res ipsa loquitur* doctrine would be applicable under only one version of the accident, the court should give a 'conditional' *res ipsa loquitur* instruction, under which the jury is directed first to decide how the accident happened and to consider *res ipsa loquitur* only if it finds that the accident occurred in a manner which fits the doctrine." *Allendorf v. Kaiserman Enters.,* 266 *N.J.Super.* 662, 669, 630 *A.*2d 402 (App. Div.1993). Here, if the jury accepted plaintiff's evidence, *res ipsa loquitur* would apply. According to Dr. Schwimmer, nerve injury in the course of an attempted tooth extraction such as performed by defendant is medically unacceptable and is an occurrence which bespeaks negligence. Although the broken part of the tooth was later extracted by Dr. Erlichman, Dr. Schwimmer adamantly ruled out his treatment as a cause of the injury since, according to plaintiff, her numbness commenced with defendant's treatment. And certainly it was never asserted that plaintiff did anything to cause the nerve damage. Plaintiff's evidence, then, established all three prongs of the *res ipsa loquitur* doctrine.

■ The trial judge, however, denied plaintiff's request to charge *res ipsa loquitur* for the following reasons:

> With regard to the res ipsa case and the request to charge on that basis. *If, in fact, Dr. Erlichman was a party to this case and was a defendant in this case, res ipsa would, in fact, be the appropriate charge, because based upon the testimony of the medical experts and the two dentists themselves, that would raise a question of control, who was in a position to know what happened or what did not happen, and take this ... out of the area of plaintiff's burden of proof and provide that*

*inference to the plaintiff. But, in fact, ... that is not the case.* Plaintiff's own expert and factual witnesses take completely divergent position[s]. And the fact questions that have been presented, the expert opinions that have been presented, clearly say to this Court that this is not a res ipsa case.

[Emphasis added.]

The fact that Dr. Erlichman was not also sued, however, does not preclude application of the doctrine. Plaintiff's burden is to exclude the possibility of another cause of the injury. The only other cause here was Dr. Erlichman. He need not be named as a defendant to be excluded as a cause; Dr. Schwimmer's evidence, if accepted by the jury, excluded him. *Contrast Posta v. Chung-Loy,* 306 *N.J.Super.* 182, 200, 703 *A.2d* 368 (App.Div.1997); *Smallwood v. Mitchell, supra,* 264 *N.J.Super.* at 298, 624 *A.2d* 623. Simply put, if believed by the jury, plaintiff's expert evidence would have allowed an inference that more likely than not defendant was negligent and caused plaintiff's injury.

■ It has been said that error in failing to charge *res ipsa loquitur* where the doctrine is applicable cannot be considered harmless. *Vespe v. DiMarco,* 43 *N.J.* 430, 435–36, 439, 204 *A.2d* 874 (1964); *Terrell v. Lincoln Motel, Inc.,* 183 *N.J.Super.* 55, 59–61, 443 *A.2d* 236 (App.Div.1982). We are convinced the error became particularly significant in the context of the medical malpractice charge given the jury. After being instructed that plaintiff must demonstrate a deviation through expert evidence, the jury was told:

In examining the conduct of a defendant dentist to determine whether there is a deviation from a standard of care, that is whether he was negligent, you should understand that the law recognizes that the practice of medicine and dentistry is not an exact science. Therefore, the law recognizes that the practice of medicine and dentistry, according to accepted medical standards, will not prevent a poor or unanticipated result. If a dentist has applied the required knowledge, skill and care in the diagnosis and/or treatment of a patient he is not negligent simply because a bad result has occurred. If you find that the defendant has complied with that standard of medical care, then he is not liable to plaintiff regardless of the results.[4]

---

[4] We note, too, the judge's initial "professional judgment" charge, which she subsequently cured. *See Morlino v. Medical Ctr. of Ocean County,* 295 *N.J.Super.*

This language tells the jury that injuries and bad results can occur even where the doctor has not deviated from the accepted standard of care and that, thus, the fact of an injury or bad result does not establish negligence. The language essentially removed consideration of Dr. Schwimmer's opinion since it was, in its essence, an opinion that the injury established the deviation. This is the very reason why a modified *res ipsa loquitur* charge was required. *See Terrell v. Lincoln Motel, Inc., supra,* 183 *N.J.Super.* at 59–60, 443 *A*.2d 236. Plaintiff was entitled to have the jury told that if it believed that the onset of her numbness began with defendant's procedures and if it believed that the risk of damage to the inferior alveolar nerve was not a normal risk inherent in defendant's procedures on plaintiff's tooth # 31, then it could infer defendant deviated from the accepted standard of care even though it might reject Schwimmer's theory that the damage occurred with the use of the elevator device. *Cf. Vespe v. DiMarco, supra,* 43 *N.J.* at 439, 204 *A*.2d 874.

## II

Plaintiff contends that the trial judge erred in sustaining counsel's objection to the testimony from plaintiff's mother and her friend concerning her complaints of numbness to them after defendant's treatment and before she went to Dr. Erlichman. The timing of the onset of the numbness, of course, was crucial to plaintiff's case. We agree that such evidence should have been admitted.

▮ Replacing former *Evid.R.* 63(12), *N.J.R.E.* 803(c)(3) continued that exception to the hearsay rule by providing:

> Then existing mental, emotional, or physical condition. A statement made in good faith of the declarant's then existing state of mind, emotion, *sensation or physical condition* (such as intent, plan, motive, design, mental feeling, pain or bodily health), but not including a statement of memory or belief to prove the fact

113, 127–28, 684 *A*.2d 944 (App.Div.1996), *certif. granted,* 149 *N.J.* 34, 692 *A*.2d 47 (1997), *aff'd as modified,* 152 *N.J.* 563, 706 *A*.2d 721 (1998).

remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

"Statements of the declarant's present bodily condition and symptoms, including pain and other feelings, offered to prove the truth of the statements have been generally recognized as an exception to the hearsay rule." *McCormick on Evidence* § 273, p. 226 (West, 4th ed.1992). "The general requirement is merely that the statements shall be the spontaneous and natural expressions of the pain or suffering." 6 *Wigmore on Evidence* § 1719, p. 103 (Chadbourne rev.1976). Therefore, if circumstances demonstrate a lack of spontaneity, the statement should be excluded. *McCormick, supra,* at 227.

As indicated in the text of the rule, the statement offered must be made in "good faith," or in a "natural manner and under circumstances dispelling suspicion and involving no suggestion of sinister or improper motives. . . ." *State v. Thornton,* 38 *N.J.* 380, 390, 185 *A.2d* 9 (1962), *cert. denied,* 374 *U.S.* 816, 83 *S.Ct.* 1710, 10 *L.Ed.2d* 1039 (1963) (applying former *Evid.R.* 63(12)). One consideration relevant to good faith is the existence of a time lag between the onset of the physical condition or sensation and the actual verbal statement of the condition. *State v. Williams,* 106 *N.J.Super.* 170, 172–73, 254 *A.2d* 538 (App.Div.), *certif. denied,* 55 *N.J.* 78, 259 *A.2d* 228 (1969), *cert. denied,* 397 *U.S.* 1057, 90 *S.Ct.* 1405, 25 *L.Ed.2d* 675 (1970) (in deciding whether a statement is admissible under former *Evid. R.* 63(12) to show the declarant's previous state of mind, "the court is invested with a discretion to refuse to admit such evidence where because of the circumstances and the interval between the time of the declaration and the previous time referred to, it concludes that there is no reasonable basis for finding that a continuity of that state of mind exists.").

In *Fagan v. City of Newark,* 78 *N.J.Super.* 294, 304, 188 *A.2d* 427 (App.Div.1963), the court determined that a man's statement that he felt ill and dizzy prior to suffering a fatal heart attack was "admissible under the rule that a declaration as to the declarant's present bodily condition and symptoms, made naturally

and without apparent premeditation, is an exception to the hearsay rule." (citing *McCormick on Evidence, supra,* § 272). The declaration does not necessarily need to be made to a physician to qualify. *Ibid.* (citing *De Palma v. Economy Auto Supply Co.,* 3 *N.J. Misc.* 827, 130 *A.* 206 (Sup.Ct.1925), *aff'd,* 102 *N.J.L.* 714, 133 *A.* 919 (E. & A.1926)). In *De Palma, supra,* a father and twelve-year old girl were awarded damages for personal injuries they suffered in a car accident. The trial court permitted the girl's mother to testify that following the accident, "[a]t night [her daughter] cried" and told her mother "her arm hurts her." *Id.* at 828, 130 *A.* 206. The court found the testimony admissible, stating "[a] nonexpert witness may testify to such exclamations and complaints as indicate present existing pain and suffering."

In the present case, on direct examination plaintiff's counsel asked Mrs. Russo, plaintiff's mother, if she had made any observations of the way her daughter drank her coffee. When Mrs. Russo began to testify as to what plaintiff told her, defense counsel objected. The trial judge sustained the objection stating:

> I tend to agree with counsel that there has been testimony by the plaintiff as to what she said to her mother as to what the condition was. The mother's purpose here is testifying as to her observations and I have no problem with her testifying as to what she observed. And I'm not certain as to whether the *DePalma* case may have, in fact, dealt with a minor child, someone who could not provide that testimony on their own. I think under the circumstances I'm going to sustain the objection.

The thrust of this ruling seems to be the availability of plaintiff to tell the jury what she had told her mother. The judge apparently thought that the mother should testify only as to her own observations. But the very purpose of the exceptions to the hearsay rule, where applicable, are to permit a witness to testify as to what someone else said.

The other disputed hearsay testimony came from Ms. Ross, plaintiff's friend and tenant, who drove plaintiff to and from her appointment with Dr. Erlichman. After plaintiff's counsel asked whether plaintiff had complained of any pain during the car ride, Ms. Ross testified "[n]o, she complained that she was numb." The

trial judge sustained defense counsel's objection to this testimony also.

These hearsay statements were expressions of plaintiff's then present sensations, or lack thereof. They were expressed shortly after defendant's treatment, and under circumstances that do not suggest anything other than good faith complaining to people one naturally would voice concerns to. There is nothing to suggest plaintiff's statements to her mother and her friend were premeditated or spoken in bad faith.

### III

The verdict of no cause of action is reversed. The matter is remanded for a new trial consistent with this opinion.